Thank you. May it please the panel, my name is Dennis Moran for Resolute Industries Inc., the appellant in this case. This comes on appeal from a second trial, a retrial after the first appeal. Let me briefly just go into the background of that so we get the perspective. This was a boat fire case in a marina up in Anacortes. The plaintiff, Oswalt, had a pleasure during the course of repair by Mr. Albrecht who worked for Resolute. Mr. Albrecht was interrupted, fire broke out, and it consumed the vessel. Mr. Oswalt and his insurance company sued Resolute for the alleged negligence acts against Resolute, Mr. Albrecht, and then Resolute 14C'd Wabasto in the underlying case, alleging that Wabasto had a negligently designed heater, should have had an automatic off switch like every other shore-side heater that exists for a lot of reasons. That was dismissed on summary judgment, so we were forced to go to trial without a second defendant. I'll point out that this was a 14C case so that Wabasto would be sitting next to Resolute had that first trial gone forward correctly as a defendant, so there would be direct claims from the plaintiff against Resolute and direct claims against Wabasto. We were forced to proceed. The plaintiff is allowed to focus on who the plaintiff wants to focus on. Absolutely. I just point that out to distinguish between an indemnity situation, a traditional shore-side party indemnity, because I think it led to further misunderstandings. So the negligence against Resolute for Mr. Albrecht's conduct, we appealed that up, essentially saying that Wabasto should have been in the seat next to us. We appealed the entire findings and fact and conclusions of law in that case. The panel remanded it, saying essentially Wabasto should have been sitting next to you and Resolute should have been allowed to put on its negligent design theory. So we went back to trial and tried the first trial, essentially the negligent design theory. The trial consisted of one witness and one exhibits. Wabasto produced no evidence in the case whatsoever. Isn't cross-examination of a witness evidence? Let me, yes, it is evidence. Cross-examination is evidence. So there was evidence? Yes. Okay. Okay. They didn't produce their own evidence or their own exhibits. It was cross-examination. If you didn't get what you need in cross-examination, is there any requirement to produce your own witness? I absolutely know and I didn't mean to suggest that. Well, but you reached several times. You said no evidence. And that's just not true. There was evidence. Evidence extracted on cross-examination. There was evidence, but no evidence that supported the findings was extracted on cross-examination. Well, that's not so clear. I mean, the witness acknowledged that this was a prototype that wasn't really in use. They hadn't built a real model. That, yes, there was some risk in having this kind of switch because a repairman would have difficulty. All of that is evidence that I think the district court relied upon in its findings. Okay. The evidence and testimony elicited from Mr. Way is certainly evidence. But even when you look at the cross-examination testimony, it did not go so far as to justify the findings. Well, that should be the core of your argument. Is the district court's findings clearly erroneous? But throughout your brief, you're saying, well, there was no evidence, so we can't possibly lose. And there was evidence, so you can possibly lose. Your issue now is whether the findings were clearly erroneous. So let's look at the findings, okay? So the first four findings are basically I'll call those vanilla factual statements about the background, right? Well, actually, if we can go back, the first page of the findings led, I think, was the big problem, and it led to the rest of the problems. And it said where it says that in line two, these findings of fact and conclusions of law were not challenged on appeal. Speaking of the finding that Mr. Albrecht was the sole proximate cause. And so the district court looked at that and said in the prior case, there was a finding that Mr. Albrecht was the sole proximate cause, okay? And there was. We appealed that. The district court looked at that and said, you never appealed it. And that's just, it's got, it's just absolute clear error. Because if we did, if that wasn't back in play, why the remand? Let's go to the findings of fact, where we start this question. Got any problems with one through four? No. Okay. Five? No. Six? No. Seven? Yes. Okay. Because in seven, that's not what Mr. Way said. That's what counsel said in terms of the less safe judgment. Well, it was clear that to defeat this, the one way you could defeat it and the way they defeat it, and we talked about the father's garage and all that, you can put a piece of tape over it, right? That's how you defeat it at your house, yeah. Well? Yeah. So that can't be wrong. But Mr. No, the process is correct, but the judgment that makes it less safe is incorrect. That's not what Mr. Way said. That's what counsel said. Okay. Number eight? That's incorrect, we think. Yeah. Well, is that an inference that can, you're saying that's not an inference that can be drawn from the testimony? I don't think it's a fair inference, because it says it could inadvertently discourage repair persons from following this. There's no testimony to support that. That's just an attorney saying that. Right. And him not disagreeing, meaning the witness. I mean, that's what cross-examination is, is you take a loaded question, right? We all know this. Irving Younger. And then you try to get the witness to agree with you, and when he doesn't disagree, then that becomes evidence, in effect. I mean, so isn't that an inference? I don't necessarily agree or disagree with what I'm just saying. Isn't that an inference? I don't think from Mr. Way's testimony, as it actually came out, that that was a reasonable inference from what he said and how he responded to the cross. And what about number nine? Number nine, yeah, that's agreed. But Mr. Way addressed that in further detail, saying so what? It's a dollar more switch or something like that, yeah. And is number ten correct? No, that's not correct. I mean, he presented the whole thing. I mean, he built it. He offered – the feasibility was the fact that he built it and had it in front of the court, yeah. I think that's tied to the temperature rating issue. I mean, that was his question of, you have these various standards. There's no standard that requires a switch, but then there's these other standards. Did he offer anything about a switch that had to do with meeting a temperature rating? Yes, he did. And I'll paraphrase it, because I didn't read it. But he basically said, yeah, that's no problem. He says he's worked with cold weather requirement switches before, and you simply buy a different switch and it costs a dollar more or something like that. It's not a big deal. It's just made of titanium rather than steel. It was something along those lines. Okay. And number eleven, that's a photo cell? That's just flat wrong. The photo cell – the district court and I think counsel for Webasto had that photo cell sensor thing flipped. Well, the testimony – the question, I guess – I read all that testimony. I'm not sure what the testimony said either. Yeah. Well, if I can – What do you think it said? That'll help us. The photo cell has to do with the operation of the heater. It's not a safety device. And it's so that if the photo cell sees light, it's because there's light from the flame. Okay? And then it completes a circuit, because that's how the thing runs. Not light from – it's not a light from the outside safety device. It has nothing to do with that. And in fact, if it did get light from the outside, it would interpret that as light from a flame, which is what happens. It's okay – the thing is – it's not a cutoff, is what I'm saying. It's when there's light, it's okay to run, because the thing sees light as light from the flame, which is – but if it gets light from the outside, it's also okay to run, because it thinks it's getting light from the flame. So that's – it's not a safety device. It's just part of how it runs. And it has no – and I think Mr. Wade, if you read real closely, he's saying that's just – that's not a safety device. That's – and it doesn't work as a de facto safety device. I think it's the same in home heaters, too, but there's no testimony on that, so I shouldn't go there. We have a lot of garage testimony anyway, so you can throw it in. Okay. Okay. So I think when you drill down on the evidence that was actually presented, it doesn't support those findings. Now, the white – let me speak with the white glove case a little bit, because the white glove case – at the outset, the white glove case says that essentially the circuit is mixed on when you need explanations and when you don't. And it's – it's no problem when a witness testifies and the district court says, you know what, I don't believe him, so I discount his entire testimony. That happens a lot. But in this case, there's no finding – there's no discussion about the district court disregarding Mr. Way's testimony. The case is – as an expert, the case is cited to support the proposition that it's okay to disregard the expert's testimony in a design case, and there's lots of them, are all Daubert cases, with the full Daubert analysis, the finding, the – the on and on and on. And that's fine. If that were done and – and there was a Daubert challenge to Mr. Way on his qualifications or the type of science or the type of testing, and then there was an order – a Daubert order that explained all that, that would satisfy White Glove, no question about it. But there wasn't anything like that here. All there was here was findings essentially based on some cross-examination where the court went too far on the – even the – using the evidence on cross-examination. And then a kind of wholesale adoption of counsel's argument without explanation as to why the uncontradicted testimony was dismissed. And that's – I think that's important. It's for the fairness, but for the appearance of fairness and the appearance of orderly decision-making, that if a district court is going to look at a witness, especially, you know, an expert witness on technical matters who is really not – I mean, he's not even been challenged on bias or anything like that. But if the court's going to just disregard it, the court needs to say, hey, look, I'm disregarding it because, you know, of this, that, or the other reason. He's biased. He doesn't know what he's talking about. He's lying. I didn't like his face. Something like that. But to simply say – to have a case where you've got uncontradicted testimony with, you know, cross-examination, of course, but then just to – to just essentially disregard everything this gentleman said. And he was a very – in the record, a very competent guy. He knows his stuff. Without any explanation, we think, does not – does not satisfy the white glove or the get-at. The white glove talks about examples where it's okay. None of them are like this. I mean, there are examples where a witness comes in and obviously has a bias. And the court will say he has a bias. And I think there was a Jones Act case, a Ninth Circuit Jones Act case, where the court disregarded the Jones Act plaintiff. And they said, well, essentially, the guy's got bias all over the place. He's the plaintiff. It's his own case. He slips and falls on lots of boats. That sort of thing. At least there's a reason set forth as to why to disregard that testimony. None of those kinds of facts existed here, and none of the reasons were articulated. And so we think it was error to just summarily dismiss Mr. Way's testimony. I can speak briefly to the sanction order, which I think is up here. I think the court should reverse the sanction order against my client and myself, because it arose out of, very simply, my client's good-faith belief that my client was trying to protect its rights and do it in the best way possible. Did it ask the court for permission to do it the way it did it? It went very quickly. There was four days and That's a question capable of being answered yes or no. Did it? You've given me the excuse before you've given me the answer no. We paid it immediately and then asked immediately And who did you pay it to? We paid it to the district court registry. And what did the order say to do? The order said pay to the other side. Is the other side the district court registry? It is not. Okay, so It's sort of an act now, ask for forgiveness later preposition. You know, in that sense, yeah. But look, there's I have never heard, I mean, your brief asserts this is routinely done. I practiced for 25 years before becoming a judge. I never, ever saw a payment to the registry when the order didn't say that. District court clerk doesn't want to take money out of the blue. It's not an escrow company. What authority was there to pay the registry in hopes of preserving a right, which I don't understand, but you hope to preserve some kind of right and didn't ask the court for permission to do it that way. How is that not willful disobedience of an order? Well, It seemed like a good idea at the time. I understand that. But how is that not willful disobedience of an order? And I don't want to get cute here, but there's grades of this. Willful disobedience would be not paying the number and just doing a note, doing it. The order didn't say pay the registry. If I've got something that says pay me and you pay somebody else, how is that not disobedience of the order? It may have been well intended, but it's plainly not following the order of the court. We thought it was substantial compliance with the order by putting the money in the court registry, where then we could make an argument as to keep it there. But you've yet to offer any authority that says you're allowed to make that judgment yourself. If the court says pay the other guy, you're allowed to decide to pay somebody else. Any authority to support that proposition? We could not. We do not have any authority that says that, nor have we ever seen a case where prompt payment into a registry resulted in any kind of sanction against a counsel or attorney. Well, I've never seen that case because I've never seen somebody try to pay the registry instead of the other guy. Well, I can step outside the record and say it's done. I can also say that you brought up our reasons for doing that because we have actually had cases where another side says you waived your right to appeal because you simply paid the judgment to the other side. All right? They haven't, you know, they were settled. Any successful? It was a colorable argument made. No, no, and we settled before the end. But it was enough of an argument where it was a danger and then people look to the attorney and say, what did you get us into? Did you waive our appeal? And we look at the Rollerblade case and say, you know what? Somebody's got a decent argument to say that you waived an appeal when you pay it directly without, you know, doing the little bit of resistance. So the judgment was made and we think simply it was a reasoned judgment. It wasn't trying to escape the court. So in that, when you say it's a reasoned judgment, what you're saying is it was deliberate, knowing, willful. That's all that the statute requires. And what you did was something that clearly was not compliance with the order. So I don't see how you have any basis for an appeal. Well, if that's the, I mean, if it's the standard is really that simple and that cut and dried, then every late motion filed, everything that doesn't strictly comply with a deadline or an order or whatever is sanctionable. I don't think it's very good. Sometimes it is and sometimes it isn't. That's what I say. But there's no case like this. Nothing that you, this was not a new matter. You've been up and down to the court of appeals several times. The order and each time your view that you weren't at least jointly and severally liable was in effect rejected. But you were submitting a clear, simple English order. We're not going to comply with it. You didn't say to the, you didn't apply to the court, can we do this instead, which is also required by the rules. You didn't seek a stay. You just said, we're going to unilaterally take a step that is different from what the order requires. Yes? To all of that, no. To some of it, yes. What is it no? To what did I say that you could say no? I'm sorry. Respectfully, you imputed a motive and a tone that was not there. Okay? But it doesn't, it's not required. Willful doesn't require bad faith. If you look at willful, it's just intending to do something like I intended with the glass. And that's what you did, right? There was no willful intent to disregard anything. There was a willful act paying money in. It doesn't make any sense. Any sense. Believe me. Any sense whatsoever. If my client's going to write the check, okay, there's no benefit to simply, with the money benefit. What benefit is that check to the plaintiff? The order says the plaintiff gets the money. The plaintiff didn't get the money. To get the money, the plaintiff had to expend effort in the form of attorney's fees. And that's what the sanction was for. To give plaintiff back the cost of getting the money it was supposed to have gotten in the first place. How's that not logical? First of all, in the form of $3,000 worth of attorney fees, not $10,000. The attorney fee order covered all the time going back to the plaintiff. And that's a separate issue that I think you have a separate argument on. The judgment was if the money is paid in with an explanation, we could preserve the right against the roller blade problem. And the delay to the money getting paid out would be a day or two or a couple of days. Remember the order said immediately back to the plaintiff. You didn't control what the registry of the court would do. And obviously it didn't get paid out that way because the plaintiff pursued a payment that was direct to them. If they'd gotten the money the next day, I doubt if they would have gone to the trouble of continuing to try to get the money directly from you. They don't get two payments. You're not alleging they got two payments, do you? No. So it wasn't the next day, now was it? No, I didn't say they could get it the next day. Look, the order came down I think on a Thursday. The client is in New York. It took four days to get the money, including the weekend. So technically, yeah, we didn't pay it on the Friday if the order came in Thursday, so we violated... Well, you never paid the plaintiff. That was the problem. The plaintiff didn't get the money. The plaintiff was supposed to get the money. When did the plaintiff finally get the money? A couple of weeks after. So it wasn't the next day, and it wasn't four days later, and from the plaintiff's perspective, they were supposed to have gotten it pursuant to the court order right away. So you can say all you want that, well, my client isn't benefited at all by this, but the plaintiff is certainly disadvantaged. The plaintiff has to go to a lot of extra effort to get the money it was supposed to have gotten in the first place. It was a minor extra effort of about $3,000 to give them their benefit. Look, let me just say, I think you grasp the facts, but you're imputing, respectfully, a motive there that's not, or was not there, that doesn't make sense to be there. I think that, as Judge Rakoff pointed out, motive doesn't really come in here. This isn't a Section 1927. I think we have your argument in mind. We'll hear from the other side. Thank you. Good morning, and may it please the Court, my name is Colin Fullon, attorney for Webasto Products, N.A. Incorporated. I'll take 10 minutes of time and cede the remaining five to counsel for Oswald. This Court should affirm, Resolute had its chance to try the case that it wanted to try. It picked its paid expert and its legal theory of an alternative design. And the record indicates that it lost the case because it proposed a bad idea and an incomplete plan. This was exposed on cross-examination. So let me ask you, in much the way that Judge McKeown was, to take a look at the specific findings of fact. So let's look at number seven, for example. The steps that a repair person would have to take to defeat the proposed safety switch, such as placing a piece of tape inside the heater, may make the heater less safe than it was without any safety switch. What evidence was there that it would make the heater less safe? Many instances of testimony, and I'll outline them here, they support both seven and eight, I would submit, Your Honor. First of all, but we have to look at the whole record. So I'm going to go through several pieces of testimony. First of all, we know the purpose of the switch was to prevent operation while disassembled. That's verbatim purported proceedings. Page 66, lines 21 through 23. But we know it was necessary to have the power flowing to the heater for certain service and troubleshooting tasks. That's page 62, lines 8 through 11. Now their expert didn't know the extent of this, but he admitted that a, quote, maintenance person, end quote, would have to defeat the switch with a piece of tape. That's page 63, lines 16 through 21. Or cut the wires, break the switch, seal contacts together, remove the switch, splice the wires, or put super glue on it. Page 81, lines 1 through 11. The expert admitted that switches can be compromised by physical contact. That's 68, lines 2 through 10. Tape has adhesive. Page 87, lines 6 through 7. Switches can erode. Page 68, lines 11 through 20. Their expert tried to show Judge Peckman this method of defeating the switch with tape. She had the opportunity to see him demonstrate it, as he proposed. That's at page 85, lines 23 through page 86, line 10. The method to defeat the switch could definitely compromise the switch. I'd like to read a short excerpt at page 81, line 17. Question. So you mentioned tape and glue and monkeying with it, the tools. You agree with me that that could cause damage to the switch and cause it not to operate, correct? Answer, yes, definitely. Continuing on. A repair person could feel like not going and turning off the power because it has a switch and possibly create a hazard. Page 70, line 20. Everything you've said so far, unless I have misheard, doesn't say that it would make the heater less safe than it was without any safety switch. It simply says that there'd be problems with the switch, but maybe you're getting to it. I am, Your Honor. And I apologize for taking the time, but I want to go through this because, as the cases say, we have to look at the whole record, not just picking sound bites. We have to look at the whole record. And then here's where we get to it. A repair person might rely on the switch unknowingly. Page 70, lines 2 through 5. It is possible that a busy repair person rather than taking the time necessary to kill the power, test to make sure it's off, would simply rely on the switch to kill the power. Page 82, lines 4 through 10. They might short-change the process. The careful process was laid out by Webasto. Page 84, 6 through 12. The court heard all of this testimony and realized, if you have a repair person that is relying on a switch and part of the function of that switch requires that you defeat it with physical contact, which admittedly of their own expert would definitely compromise the switch and it could erode, you have that very problem of increasing the risk of harm because these service people have to go in and monkey with the switch that they're proposing. If they rely on it, they do so at their peril and it complicates the process. You see the courts thinking about this at closing arguments. The court says at page 95, line 20, let's go back and talk about the suggestion of your switch. I have to say that repairmen going in and sticking tape in or otherwise overriding whatever way they think is appropriate sounds kind of dangerous to me. And isn't that the sort of thing that you want to make sure people don't do? That if they have to do troubleshooting, you don't want them overriding because maybe the next time it opens up, the adhesive on the connection doesn't work and the power isn't off. It seemed kind of odd to me that that's the suggestion you make, that people are supposed to come up with their own way to override in order to troubleshoot. Page 95, lines 20 through 96, line 2. Counsel's response to that was to attempt to frame it in a way that was helpful to his case, but he admits this introduces new risk. Counsel says, among other things, quote, maybe that introduces a new risk of a tiny amount in a different direction. You're adding a little bit of risk over here. 97 lines. So I guess let me reframe the question, although what you've said is very helpful. I'll give a very bad analogy, but just to illustrate the point. You can, in combating a disease, you may develop a new drug, but the new drug has its own bad side effects. But in many, many cases, the benefits of the drug would still outweigh the risks of side effects. Here, Judge Peckman, it's a little unclear what her basis on which she, in effect, is concluding that the risks outweigh the benefits, which is implicit in what her finding. Well, in your honor, I'd submit that that's more of a conclusion of law question than the finding of fact, which, and for the record, although they've raised conclusions of law issues, they've discussed that in the brief, there's really no legal error that they've assigned to any conclusions, so we really are talking about factual findings. And I'd answer that question by saying, when you have a proposed alternative design that introduces new variables and new things that will fail upon which people will rely, this switch is, as they've argued, attached to the heater. She had the opportunity to see this heater, see him try to defeat the switch, and see the complication that that introduces into the process. I think it's certainly a fair inference that that increases the level of risk. And when you combine that with the support for finding of fact number 10, I think it becomes very clear there really was no evidence about cost or feasibility of designing, testing, or manufacturing a safety switch that met the same temperature rating as the rest of the heater. First of all, they did no physical testing, page 56, lines 9 through 13. This is a heater, a marine heater, but they never fire tested it, excuse me, fired the heater or did any flame testing, page 56, line 13. Their expert didn't study the manual, so he didn't even know what the troubleshooting activities were involved that required power and disassembly, page 65, line 1 through 14. And when they mounted this switch, they did it with an epoxy, and he didn't even know the instructions from the switch itself for mounting it, page 72, lines 14 through 21. Their expert did not know the temperature rating of the heater itself, 73 lines 13 through 20. So he made reference to the fact that at one point the expert said something to the effect of, well, it would only probably cost a dollar more for this or that, but was that testimony tied to the temperature requirement or no? Your Honor, we don't have testimony about the cost of the switch. The reference to the $3 was made in the trial brief, and the response from their expert about, well, you'd have to go get a different switch, is so vague that they don't have evidence of the cost. In fact, if we look at page 74, lines 12 through 16 of the verbatim report of proceedings, he doesn't know the cost of a properly temperature rated switch. He doesn't know the cost for testing, for temperature suitability, shock vibration, or salt spray environmental testing. Remember, this is a marine heater. That's pages 74, line 5 through 11. And their expert even admitted under oath that this switch, which is made of plastic, that plastic becomes brittle at low temperatures, page 75, lines 12 through 13. When you look at this whole record, you have somebody proposing a very bad idea with a switch that doesn't make sense for this particular heater. He admitted that as much. It's a plastic switch. He doesn't know what the temperature rating is. It doesn't make sense to me. And the fact is, I also want to make clear for the record, this was not a retrial. It was not a retrial. It was a trial of the issues against, alleged against Webasto. Can you address the last point about the photo cell sensor, which seems to have everybody coming and going at the trial? Yes, Your Honor. And I think one of the better places, there are multiple examples, as Your Honor understands, but at page 79, lines 11 through 21, we see Mr. Greenfield ask, the question, sir, is, if the burner head separated from the heat exchanger and the photo cell senses light, I think you testified you will agree it will prevent the igniter from sparking, correct? Answer, that's correct. So the photo cell, just to make sure that we're clear, is a device whose function is to sense light of a specific type of intensity, and if that light is sensed, it produces a voltage signal to the control module that the logic inside the module will then use to decide if there's a flame present or not. That's the function of the photo cell. So, and there are other instances in which the photo cell is mentioned as well. Judge Beckman noticed one of them had a double negative, and so that was corrected later in the testimony. But the fact is that the photo cell by itself is not necessarily dispositive when the plaintiff in this case, the third-party plaintiff, had the opportunity to meet their burden of proof and utterly failed because their design simply was not appropriate to the reasonable inference from the evidence in this record. It introduced new risk. And contrary to the argument of counsel, it's not like every other here. I think as Your Honor's mentioned, none of the standards require or are contemplated using this type of switch. You might want to wrap up since you're kind of eating into your counsel's time, unless there's other questions from the court. Thank you, Your Honor. I'll see you the rest of my time. May I ask that you please affirm? May it please the Court. My name is Tony Gaspage. I represent the plaintiff of Petalese, Curtis Oswald, and Federal Insurance Company. This is the third time that I've been back before this Court in this case. I don't want to say it's tedious, but it feels that way. I think Your Honor's That really hurts. That was directed more behind me than in front of me. Please. You can always settle if you don't want to come here. Well, not always. This case went to trial. It was affirmed. There was a mandate to pay my client's money. That was opposed in every way possible by Mr. Moran and his clients. Let's cut to what I think is a harder issue, which is why should you get as much as you got? Why should you get as much as you got? You're not talking about the judgment, I take it? No, I'm talking about the sanctions. Why should the sanctions be warranted? Yes, and particularly for fees that were incurred before this event. Because, for a basic reason of what Your Honor's asked Mr. Moran about extensively, is that the judge made an inherent finding that there was that are reasonably related to that conduct, and the conduct was basically keeping away. How can your fees before the conduct occur be reasonably related to the conduct? Well, the conduct was willful disobedience of the order, but in a more general sense of what was before the court, was this was refusing to pay the judgment, willfully not turning over the money. So, therefore, the judge, we argued and the judge accepted that all of the actions that were related to that were related to the bad faith conduct here, which was the failure to comply. I'm missing something. Okay, so money's supposed to be paid on a Friday? Not practical, obviously. Sometimes you've got clients elsewhere, you've got banks, that sort of thing. So, what's related, what fees did you incur that are directly related to not paying the money to your client, as opposed to the registry of the court? What I think you're saying, Your Honor, is basically that there's a difference in time between when the disobedience of the order took place versus the refusal to pay the judgment. Is that the essence of your question? Right. Well, there is this distinction, because once the order comes down, at that point, there is a, the disobedience comes up to the order. But in general, and what was before the court, and what the court noted in the order, is that there was an ongoing refusal to pay, which there in the evidence in the record is replete with the bad faith of Resolute and the surety in their counsel, and not refusing to pay when a mandate had issued. And I think that the judge's order also specifically focused on the willful disobedience, which occurred from the date of the order, but also included the time previously, because there was a long history of refusing to pay from the moment the mandate had issued. You mean a long history. I guess I'm missing something here. Well, a long history, meaning going back a month from when the mandate had issued. So at that time, once the mandate had come down, there had been a demand for payment. That was refused. There had to be filing a motion to compel the payment. That was granted. Mr. Moran wrote an e-mail saying we will pay exactly as would be required. Then he turned around and deposited it to the court, and I would say that in my 25 years of practice, I've never seen it happen either. I don't know where that's coming from. But then when it went into the court, there was an initial inquiry to the court about it must be a mistake, and the judge's law clerk wrote an e-mail to Mr. Moran saying our intent, to the extent it's not otherwise clear from the order, is that you should pay Mr. Gaspard's clients. He was sent that. And then he responded by filing a motion to say, oh, well, we think you can hold it. We're not going to cite any authority, but we think you can hold it. So basically there was a course of conduct over the month beforehand. There's a key point in time here. That is the decision to pay the registry rather than what the order said to you and your client. And the court could say and did say that was willful disobedience of a court order. Bad faith really isn't necessary for that element. It may have been well intended, but the court order was explicit. It didn't follow the court order. You're going to be sanctioned for that failure. To reach earlier in time, you're suggesting a broader finding. That is that we have here a sustained pattern of misconduct. But at that point, bad faith does have to come into it. I mean, I don't know what Washington state law says with regard to recovering the cost of collection, but the district court didn't seem to make the award based on that. This is a sanctions award. Well, I have a harder time saying, well, what's done later where bad faith, there may have been a reason for it, even though we didn't think the reason was particularly good, but it was disobedience, so sanctions are appropriate. I don't know how that translates back into supporting an award for earlier conduct, for which you need the bad faith finding. And what's the basis for the bad faith finding? Well, the basis would be basically what I just explained as far as the conduct of counsel and his clients in refusing to pay the affirmed judgment. The court could have entered, I mean, in that theory, when it entered the order that says pay the client, pay the plaintiff, could have said, because you haven't paid yet and you really should have, we're going to ding you for it, we're going to make you pay for the collection efforts of plaintiff's attorneys to get us to this order. The court didn't do that. And I guess it could be that the subsequent conduct may have tipped the balance in the court's mind, but I don't see in the order that was entered the kind of findings for bad faith that we'd ordinarily see if bad faith were required for a given sanction. Well, two responses. First, that the judge did make reference to the ongoing course of bad faith conduct, so that was foremost that was in the judge's mind. Two is that even though it does not mention bad faith with respect to the prior conduct, I will acknowledge that, but under cases of this court, the BKB case and other courts, if it's patent on the record, then this court is entitled to look at that and rely upon that for the award. The BKB case was a situation where the district court judge didn't believe there was bad faith, and when that went up on appeal, the Ninth Circuit panel deciding it said, yes, it's clear to us this is bad faith, and therefore they made that final opinion. I hear what you're saying, but focus on what tipped the balance, that is the payment to the court registry. No question that didn't comply with the court order. But what's the evidence of bad faith there? I mean, defendant's out the money. It doesn't help defendant because the defendant, and I've forgotten what the amount of money was now, but the money's out of the defendant's pocket. Well, that's not necessarily true because the defendant didn't pay it. It came from the surety. The defendant was never out the money. It came from the surety. So there's no evidence that the defendant was ever out the money. There was a one-third of a percent post-judgment interest rate in here. There was a huge financial incentive for them to gum up the works. Now I may have just missed something. What was paid into the registry? The motion was against the appellate surety from the original appeal. Collected on a surety bond? Yes. That was from One Beacon. That's why One Beacon was sanctioned also because it was their money. The motion was against them to pay, and they also participated in this conduct to refuse to pay. So, therefore, the financial incentive to resolute, again, in more of the bad faith involved here, was that they were getting free money, a free loan, where they didn't have to pay this debt for a third of a percent. So they had every incentive to hold off on this for paying this. So that was their incentive and why this was just the straw that broke the camel's back. But one other thing is that there was never any, ever any legal foundation or viable legal theory put forth to justify this. Now, Mr. Moran mentioned the ---- Right, but, you know, on appeal, we're not going to impute Section 1927 or something else. I mean, the district court said you didn't follow the order. That conduct was willful. I'm awarding fees. And you want to, like, reconstruct the whole process. I mean, maybe you're right. I mean, and all this did go on, and one could draw inferences. But in terms of what they were sanctioned for, and you don't get sanctioned for everything you do that doesn't follow a court order, as Mr. Moran pointed out, but what they were sanctioned for and what fees were awarded for seemed to be one is broader than the other. I mean, that's what we're struggling with here. I understand that point. And yet where you're going, it seems to me you would have to get into the bad faith and the history and all that. But that's not really what they were sanctioned for. I mean, maybe they should have been. I don't know. Or maybe you asked for that to be sanctioned for that. But that's not what the court order said. And so we're only ---- we're kind of constricted, I think, on review. I don't think we can impute all these collateral facts. Well, I think you can. I think the BKB case and the Primus Automotive case says that if the facts are in the records to support it, then you do have the power to say, yes, that was bad faith and that does support the award and we can affirm it. One broader issue that I would like to raise, which was the first in our argument, about whether this court has jurisdiction to even consider this in the first place. This ---- filing a timely notice of appeal is jurisdictional. It's 30 days after an order. This notice of appeal on this issue was filed 218 days later. Under the Cruz case, which I think is quite on point, that's a situation where judgment was entered on summary judgment and multiple post-trial motions. And the defendant in that case filed notice of appeal on each of them more than 30 days. And the Ninth Circuit said they simply had no jurisdiction to consider the issue. So that ---- Well, that was where the judgment was entered first. The judgment was entered first. And then the ---- But the judgment has been entered first in this case. In fact, the two prior panels in this case have said that there was a final judgment, as between Mr. Moran's client and our clients. So that's law of the case. There's no issue there's a final judgment. That can't be revisited. So the question was, did he file timely in connection with that final judgment? And the answer is no. So on this particular issue, this Court does not have jurisdiction to even weigh upon this issue, which is the quick answer. Now, Mr. Moran has cited one case, Cordage, to say that it all doesn't apply, but Cordage is inapposite. Cordage involved an interlocutory appeal, and that's not what's involved here. This is a final judgment. But even if you take that logic that because he's saying it's a multi-party case, it's more like an interlocutory appeal, therefore it's not a final judgment. But the reason that fails is because if Mr. Moran focused on an argument he made earlier in the case about 54D, even an interlocutory order can be appealed if there's a certification of a final decision under 54D. So the mere fact what he's arguing is that it's multi-party doesn't change things. I'm a little unclear about your argument about final judgment. The first appeal was from, yes, from a final judgment. But this court reopened part of the case, in effect, and said the case against Webasco or whatever it's called should be retried. And that didn't occur until after the events that were the subject of the sanctions motion. And it was only after that occurred that there was again a final judgment. Why do you think there was a final judgment at the time the sanctions motion came down when the Webasco part had not yet been tried? Well, the short answer, Your Honor, is because this court said so. Where did it say that? First of all, after the first one, which you've mentioned, but I'm going to read from the court's decision on the second appeal last December. It's a non-precedential opinion, yes? Non-precedential? It's an unpublished opinion. Well, doesn't it say this disposition is not appropriate for publication, is not precedent except as provided by Ninth Circuit Rule 36.3? Correct. So you're saying it's law in the case because of Rule 36.3? Correct, Your Honor. It is law in the case. And what the court wrote in page 4, in this case there has already been an appeal from a final judgment, and the Myth District Court was merely enforcing the mandate as it was obligated to do. That's correct. That's true. But that doesn't say there's been a new final judgment. The original appeal was from a final judgment, but once the case was reopened there was no longer a second final judgment. Well, the second final judgment deals with a completely different party. It's a completely different claim. I don't know, but the case was reopened. I mean, if a final judgment is entered and then it's reversed, and this court says we want you to go try X, Y, and Z, which you gave summary judgment on, are you saying that any order that comes down while those other parts are being played out could be immediately appealed because there was an earlier final judgment? No, that can't be right. Well, any parts with respect to the plaintiffs with whom a final judgment has been entered and affirmed and a mandate issued, yes. As to the other parties, the answer would be no because there is no final judgment. So you're saying a partial final judgment of Rule 54B kind of thing, but that wasn't what was involved here. No, that was not involved. It was treated throughout as one case. All parties were in the case at one point. Yes. But it wasn't once. The judgment, the final judgment that was the subject of the first appeal involved all parties. Some of it was reversed. Some of it was affirmed. So there was no new final judgment in the entire case until the part against the third party was against what Baskin was finally deciding. Your Honor, all I can say is that I understand exactly the point you're making, but all I can say is then this Court would have to overrule Cruz. It's a prior decision because in that case there was a judgment and post-judgment orders, and those were found untimely. Now, Your Honor is saying that because there's a different party and a whole different claim, effectively an indemnity claim, that that kind of reopens the judgment as to my clients. And we would submit that we could be drug along in this case for ten years having nothing to do with it, already having collected all of the money. Well, that's why Rule 54B exists to allow judgments to be entered. When there isn't a final judgment, a final judgment can be entered in part of the case to prevent those kind of things. But that didn't happen here. Well, Your Honor, that was the exact argument that was made in the second appeal in this case by Mr. Moran and was rejected by a prior panel. So the relevance of 54B to the situation has already been ruled upon. No, but I'm just saying the fear that you're expressing about things can go on forever is normally dealt with by Rule 54B. It's not a fear that Congress and the courts have not been aware of. There is a standard way of dealing with it. But that doesn't turn a nonjudgment into a reopened final judgment into a new final judgment, which is essentially what you're saying it is. Well, Your Honor, again, all I can refer to is this Court's opinion in the second appeal in which it said 54B deals with time to appeal, does not deal with finality of judgment. Right. So there's already been a ruling. One last point I'd like to make. Yeah, why don't you? We've exceeded by a wide margin, so I don't think there's any. We've got your argument well in mind, so why don't you make one last point? One last point is I would make on the amount of the sanction, Your Honor. The judge awarded 60% of the amount requested. If, to the extent this panel should find there's some validity as far as it wasn't supported or it can't go back and look at the other conduct that was in the record to sustain it, the judge did not award for the post the time for the reply on the motion to Mr. Moran's motion, which is $6,500. He's arguing about $6,200. So to the extent that this court feels that it can't award the prior time, we would ask that you remand and let the court review that and reconsider that for an assessment so she can consider that additional time. It will net itself out. So thank you. Thank you. I'll give you a couple of minutes for rebuttal, even though we've exceeded everyone's time here. Thank you. We have the luxury of being the only argued case this morning. What a luxury. Thank you for the indulgence. I'll just briefly address two points. The first one was the financial benefit issue because I think you got a little inaccurate picture here. Resolute was a fully insured party by one beacon. One beacon was also the surety. One beacon is paying this no matter what. Okay. There's no financial benefit to Resolute. Counsel tried to create an appearance of a difference so he could – anyway, I'll leave that to you folks to process. The second and last point I'll make is, look, this is – I'll try to bring this back around. This is about a heater that is not just in boats. It's in lots of boats. It's in buses. It's in RVs. It's all over the place. Okay. It's a heater that doesn't have an off switch, and the switch we're talking about is something like this big, and when you push it down, the current is on and it runs, and when you open the device, just like the home heater, the button goes up and the current is off and it's safe. It's that simple. Neither the district court nor the court of appeals is required to jettison common sense, but I'm just going to ask you, this is common sense about a fundamental, very simple safety device that ought to be in these heaters, and if our passion is maybe leaking through a little bit on this case and if the court thinks we've pushed this up on appeal once and on appeal a second time, it's because this is something that's important. This device is out there. They start on fire. There's lots of fire cases with this heater, and it's simple to make it safer and to eliminate that, and products liability is one of the ways where products are forced to be safer, and yeah, like seatbelts, you know, it took a long time to get something that simple, and you know what? Seatbelts create an additional risk too, right? You can get injured by a seatbelt, but would anyone in their right mind, anyone applying common sense say that we ought not to put seatbelts in a car? Thank you. Thank you. Thank all counsel for your argument this morning. The case just argued is submitted and we're adjourned.
judges: Rakoff, McKeown, Clifton